Preston J. MILLER et al., Appellants,

v.

NORDAN–LAWTON OIL AND GAS CORPORATION OF TEXAS et al., Appellees.

No. 25852.

United States Court of Appeals Fifth Circuit.

Dec. 3, 1968.

D. Mark Bienvenu, Lafayette, La., for appellants.

Frank M. Lamson, Port Arthur, Tex., John C. Camp, Lake Charles, La., John A. Bivins, Lafayette, La., for appellees.

Before GEWIN and BELL, Circuit Judges and BOOTLE, District Judge.

GRIFFIN B. BELL, Circuit Judge:

Appellants sought a judicial cancellation of the oil, gas, and mineral lease which forms the subject matter of this controversy. They claimed that the lease was breached by reason of the alleged failure of lessee to pay shut-in or, as termed in the lease, "in lieu" royalties. The District Court, in an opinion which included findings of fact and conclusions of law, concluded that the claim was without merit. Nordan-Lawton Oil and Gas Corporation of Texas v. Miller, D.C.W.D.La., 1967, 272 F.Supp. 125.[1] We affirm.

The lessee paid lessors the sum of $32,000 for the privilege of exploration and $1,000,000 for the privilege of drilling on lands consisting of 4,870 acres. The sum of $2,828,681.51 was expended in drilling operations. These operations resulted in the drilling of nine wells, four of which were dry and one of which produced for only a short time. This left producing wells known as Burton-Miller Nos. 1–D, 3, 5, and 7. The result was a disappointment to lessors and lessee.

Lessee entered into a gas purchase contract with Trunkline Gas Company on November 20, 1959, shortly after Burton-Miller No. 1–D was completed as a producer. The reserves under the leased premises were dedicated to the pipeline company on a take or pay basis in the amount of an annual quantity equal to an average of 1,000 MCF per day for each 8,000,000 MCF of determined gas reserves. The contract provided for a redetermination of the reserves by either party. It was agreed that the reserves were 18,500,000 MCF which meant that the pipeline company was obligated to take approximately 2,300 MCF of gas per day.[2]

It is the position of appellants that the lease was breached by reason of the requirement in paragraph 8 of the lease for shut-in payments and the failure to make such payments. This paragraph provides in pertinent part:

" * * * It is further agreed that Lessee, when a market cannot be secured for gas from a well or wells producing gas only, and such gas is not being utilized or sold on or off the premises, [will] pay lessor 'lieu royalty' at monthly intervals, in advance, commencing six months after the date on which such well is completed as a producer of gas, a sum equal to one

1. The opinion deals also with the additional contention of appellants-lessors that lessee breached the lease through the failure to reasonably develop the leased premises. This rests on the claim of a failure to produce and market the natural gas which was capable of being produced. There is no appeal from the rejection of this contention.

2. The lessee did not press the pipeline company to take more production because of the belief, in light of the subsequent drilling, that the reserves had been over estimated. Hence, any redetermination of the reserves would have resulted in a reduction of the daily take from the lease.

twelfth (½₂) of the annual rentals due for the then current year, * * * "

Lessee answers by saying that it secured a market for the gas produced from the leased premises and thus fully complied with the terms of paragraph 8.

This brings us to the crux of the present controversy. Did the District Court err in holding that wells Nos. 5 and 7 were not shut-in for lack of market or, alternatively, that a market had been secured for the production of these wells by the execution of the gas purchase agreement with the pipeline company. It is undisputed that they were, in fact, shut-in.

■ We conclude, as did the District Court, that the lease in no way specifies what constitutes a market for discovered gas. Appellants urge that paragraph 8 suffices for this purpose. Their contention is that the following portion of paragraph 8 indicates that a market must be secured for each well:

" * * * it is further agreed that Lessee, when a market cannot be secured for gas from a well or wells producing gas only, *and such gas in not being utilized or sold on or off the premises,* [will] pay Lessor 'lieu royalty' * * * ". (Emphasis added)

This position is not well founded. The language in question is not altogether clear but we perceive that its purpose is to classify disposition as between gas that is marketed through a pipeline source and that which is used for some other purpose so as to require shut-in royalties, in either event, where the gas is not being marketed.

■ We do not read the lease as requiring that every well produce at all times at full capability; otherwise it will be considered shut-in for lack of a market. To the contrary, our reading of the lease indicates that there was no express agreement between the parties as to the meaning of market in the sense of when a market could not be secured for gas within the contemplation of para-

graph 8. Unquestionably the Louisiana law is that a lessee must comply with the lease terms with exact preciseness. Bollinger v. Texas Company, 1957, 232 La. 637, 95 So.2d 132. Each lease, however, must be construed in light of its own terms and we conclude that the parties used the term "market" here as it is customarily used in the oil and gas industry. The lease was prepared by lessors and it was they who failed to give any more specific direction to the question. Any ambiguity must be construed against them. Odom v. Union Producing Co., 1962, 243 La. 48, 141 So.2d 649.

Shut-in or in lieu royalties were devised to benefit both the lessor and lessee from the standpoint of insuring exploration for and the production of minerals in paying quantities so that both parties will reap the expected benefits. A clause embracing such a provision is for the purpose of protecting the lessor where there are wells capable of producing in paying quantities but where no market can be found for such production. Under this type of clause the lessor or royalties owner is paid a stipulated sum while the production is shut-in. At the same time the lease is maintained instead of being cancelled for lack of production. See Malone, The Evolution of Shut-In Royalty Law, 11 Baylor Law Rev. 19; Kieffer, Problems in Connection with Shut-In Gas Royalty Provisions in Oil and Gas Leases, 23 Tulane Law Rev. 374.

■ The District Court heard evidence regarding standard practices in the industry for securing a market for gas. He concluded that lessee secured a market for the gas. We agree. A gas purchase contract such as was entered into with the pipeline company is well known in the industry as is the dedication of the reserves under the leased premises. See Williams and Meyers, Oil and Gas Law, pp. 89, 168. It was undisputed that the price to be obtained under the contract was excellent. The contract provided for a depletion of the reserves over a period of 22 years in an orderly manner and the ratio of the pay

or take provision to the reserves was normal. All of the reserves were being marketed under the gas purchase contract including those under wells Nos. 5 and 7.[3]

We are satisfied that the District Court did not err in concluding that the wells Nos. 5 and 7 were not shut-in for lack of a market, and that a market, within the contemplation of the lease, was secured by the execution of the gas purchase contract with Trunkline Gas Company.

Affirmed.

3. For reasons of its own, lessee shut-in wells No. 5 and 7 from time to time and for substantial periods of time. Well No. 7 was shut-in throughout the period of time in question. The amounts marketable under the contract with the pipeline company were supplied out of wells 1 and 3. It is uncontradicted that the amounts sold the pipeline company in every year were more than the minimum take requirements of the contract.

There were at least two reasons which prompted the lessee to supply the requirements out of only two of the wells. The low rate of flow which would have resulted from supplying the requirements of the contract out of the four wells simultaneously would have reduced the recovery of condensate from the wells. Another reason was that the reduced rate of flow might have resulted in the freezing of one or more of the wells because of hydrates forming in the line. In the view we take of the case, that a market was obtained, these reasons are irrelevant.