853 So.2d 756 (2003)
A.J. BRADFORD, et al., Plaintiffs/Appellees/Cross-Appellants,
v.
ONSHORE PIPELINE CONSTRUCTION CO., INC., Defendants/Appellants/Cross-Appellees.
No. 37,421-CA.
Court of Appeal of Louisiana, Second Circuit.
August 22, 2003.
Rehearing Denied September 18, 2003.
*757 Jones, Walker, Waechter, Poitevent, Carrere & Denegre, L.L.P., by Carl D. Rosenblum, Alida C. Hainkel, Liskow & Lewis, by Patrick W. Gray, Lafayette, Shotwell, Brown & Sperry, by Edel F. Blanks, Jr., Monroe, for Defendant/Appellants, Eland Energy, Inc. and Delhi Package I, Ltd.; and for Defendants/Appellees, Sun Operating Limited Partnership and Oryx Energy Company.
Hayden, Moore & Ryan, by Gregory Scott Moore, Lovell E. Hayden, III, for Plaintiffs/Appellants, A.J. Bradford and Vinyard and Sons, Inc. and for Plaintiffs/Appellees Lewis Hubbard and Herman Sandford.
Before BROWN, STEWART & PEATROSS, JJ.
PEATROSS, J.
This appeal arises from a trial court judgment in favor of the plaintiffs, Vinyard and Sons Oil and Gas and A.J. Bradford (collectively "Plaintiffs"), and against defendants, Eland Energy, Inc., individually and as managing general partner for Delhi Package I, LTD (collectively "Eland Energy") and Onshore Pipeline Construction Co., Inc. ("Onshore"); and dismissing the claims of Plaintiffs against defendants, Sun Operating Limited Partnership ("Sun Limited") and Oryx Energy Company ("Oryx Energy"). Both Plaintiffs and defendant Eland Energy now appeal the judgment of *758 the trial court. For the reasons stated herein, we affirm in part and reverse in part.

FACTS
On July 15, 1987, Sun Limited entered into a gas purchase contract with Vinyard and Sons Oil and Gas to purchase gas produced from gas wells identified as Vinyard No. 1, Vinyard No. 2, Vinyard B No. 1, Vinyard C No. 1 and Vinyard D No. 1.[1] These wells are located in what is known as the "Big Creek Field." The "Big Creek Gathering System" gathered the gas produced from the Big Creek Field and transported it to the Delhi gas processing plant.[2] On September 24, 1990, Sun Limited entered into a gas purchase contract[3] with A.J. Bradford to purchase gas from a well identified as Ben S. Pipes No. 1.[4] Meters were installed near the wells owned by both Plaintiffs and the meters became the mutually agreed upon delivery site. After the gas passed through the meter, it became the property of the buyer.
On December 31, 1990, Sun Limited sold the Delhi Plant, Big Creek Gathering System and its gas purchase contracts, including Plaintiffs' contracts, to Eland Energy. As a result of this contract assignment, Eland Energy assumed the obligation to purchase gas from Plaintiffs' wells under the gas purchase contracts. On May 24, 1991, the gas purchase contract between Sun Limited and A.J. Bradford was amended by Eland Energy and A.J. Bradford to add to the original gas purchase contract the gas wells identified as Lewis Hubbard No. 1, Lewis Hubbard No. 2 and Lewis Hubbard III No. 1.[5] Later, on February 25, 1992, Eland Energy transferred the Big Creek Gathering System to Onshore. This assignment stated that it was made "subject to" all of the terms and *759 conditions of the gas purchase contracts existing as of January 1, 1992. Eland Energy retained ownership of the Delhi Plant and the gas purchase contracts.
Subsequently, Onshore made a demand on Plaintiffs to sign a new agreement that would result in a transportation fee of fifty cents per MCF[6] for all gas passing through the Big Creek Gathering System. Plaintiffs were also asked to assume line loss of the gas as it passed through the Big Creek Gathering System, which changed the agreement between the parties that, after the gas passed through the meter, it became the property of the buyer.[7] After receiving these demands, Plaintiffs asked to meet with representatives from Eland Energy and Onshore. On March 25, 1992, Eland Energy and Onshore met with Plaintiffs. Refusing to sign the new agreement with Onshore, Plaintiffs demanded that Eland Energy honor the existing contracts to purchase the gas as agreed upon in those contracts. Only one day later, on March 26, 1992, Onshore forwarded a letter to Plaintiffs advising that the gas flow through the meters at their wells was insufficient; and, pursuant to the Unprofitable Gas Clause in the existing gas purchase contracts, Onshore would no longer purchase any gas from them effective April 1, 1992, and the meters would be removed. The Unprofitable Gas Clause states:
Buyer agrees to take gas testing more than 2.50 GPM except as herein provided. Seller shall have the right to dispose of any gas not taken or paid for by Buyer, provided that Buyer shall have the right to take any or all such gas at any time hereafter conditioned upon Buyer giving Seller at least thirty (30) days notice of its election to do so. In the event the gas from any well or wells, or from any point of separation of the oil and gas, on said leases becomes insufficient in volume or liquids content, or for any other cause becomes unprofitable for the extraction of liquids therefrom, Buyer shall have the right to cease taking such gas so long as such condition exists. It is further provided that if any time the volume and/or liquids content of the gas available to Buyer, or if any cause beyond its control, shall render the operation of said plant unprofitable, Buyer may, by thirty (30) days written notice and payment, or tender, to seller of Ten Dollars ($10.00), cancel this contract.
In response to Onshore's letter, Plaintiffs closed the valves on their wells in order to prevent damage to the wells. Eland Energy and Onshore have refused to purchase any gas from Plaintiffs' wells since the sale of the Big Creek Gathering System in February 1992.[8]
On June 23, 1992, Plaintiffs brought this lawsuit alleging a breach of contract claim against Onshore. Plaintiffs later amended their petition to include Eland Energy, *760 Sun Limited and Oryx Energy[9] as additional defendants, alleging that either Eland Energy or Sun Limited/Oryx Energy failed or refused to purchase gas from their wells as required by the gas purchase contracts. Plaintiffs argued that they had suffered loss of revenue due to the refusals of Sun Limited and Eland Energy to honor their contractual obligations to purchase the gas from their wells. In addition to loss of gas revenue, Vinyard and Sons Oil and Gas asserted that it had sustained a loss of oil revenue because it was unable to produce its oil without the production and marketing of the gas from its wells.
In January 1996, Plaintiffs sent a letter to Eland Energy indicating that they intended to commence delivering their gas on February 1, 1996, and threatened to seek injunctive relief if the delivery was interrupted. Eland Energy, in turn, sent written notice to Plaintiffs cancelling the gas purchase contracts after invoking the Unprofitable Gas Clause's termination provision, with checks attached to the notice for $10 to each Plaintiff.
A trial on the merits was held on March 12, March 13, April 30 and August 16, 2001. At trial, Eland Energy argued that it and Onshore were entitled to cancel the gas purchase contracts under the Unprofitable Gas Clause in 1992 and that it did not have to give 30 days notice to Plaintiffs. The trial judge did not agree with that argument. Specifically, the trial judge found that the Unprofitable Gas Clause was somewhat ambiguous concerning the notice requirements and that it could easily be construed to require a 30-day notice. More importantly, the trial judge concluded that the profitability of the gas had nothing to do with Eland Energy's decision to terminate the contracts in this case. In support of this conclusion, the trial judge cited the testimony of Thomas H. Hilton, the operations manager for Eland Energy, who stated that Eland Energy only wanted the oil wells on the property and Eland Energy did not intend to process gas, other than lift gas to get oil, at the time it purchased the Delhi properties.
At the conclusion of the trial, the trial judge found that Eland Energy committed a bad faith breach of its obligation to purchase gas from the Plaintiffs' wells under the terms of the gas purchase contracts, holding that Eland Energy had a right to sell the gathering system, but it had an obligation to purchase the gas from Plaintiffs' wells at the meters located on their property.[10] Further, he found that Onshore attempted to unilaterally change the terms of Plaintiffs' gas purchase contracts and, in effect, forced them to shut-in their wells.
The trial judge did find, however, that Eland Energy effectively cancelled the gas purchase contracts with Plaintiffs under the Unprofitable Gas Clause after sending them a letter on February 12, 1996, and tendering to them the requisite $10. The cancellation was effective 30 days after the date of the letter. It was noted by the *761 trial judge that Eland Energy had given the proper 30-day notice of termination to Plaintiffs. The Plaintiffs were awarded damages for loss of production revenue from April 1, 1992, through March 1996.
At trial, both Plaintiffs and Eland Energy provided expert testimony as to the amount of damages at issue. Eland Energy argued that the damages were minimal and that Vinyard and Sons Oil and Gas could not claim for loss of oil production because the contracts were gas purchase contracts. The trial judge found, however, that the trial testimony established that Vinyard and Sons Oil and Gas could only produce oil if the gas was produced and purchased. Eland Energy further argued that it acted in good faith when the gas purchase contracts were terminated and that Plaintiffs' recovery was limited to foreseeable damages and the loss of oil revenue was not foreseeable. The trial judge found that Eland Energy was not in good faith because it interjected Onshore into the gas purchase contracts; was aware of Onshore's activities; should have required Onshore to honor the existing contracts; allowed Onshore to attempt to unilaterally change the terms of the existing contracts, in effect, shutting-in Plaintiffs' wells; and Vinyard and Sons Oil and Gas lost oil revenue was foreseeable.
Eland Energy further argued that Plaintiffs failed to mitigate their damages by selling their gas to Onshore at a reduced amount. The trial judge rejected that argument because Plaintiffs were not given time to produce their gas at a reduced amount, considering the fact that Onshore sent the termination letter to Plaintiffs the day after meeting with them.
The expert for Plaintiffs calculated damages for loss of production from Plaintiffs' wells without deducting costs of production. The expert for Eland Energy made similar calculations for the loss of production, but deducted $400 per month per well as costs of production.[11] The trial judge found that it was the Plaintiffs who performed most of the duties required for maintenance and production with these wells, whereas the estimates by the expert for Eland Energy included reliance on outside interests to perform the work and expenses, such as office space, secretarial staff and other expenses that small, independent producers such as Plaintiffs would not incur. Using the calculations provided by Plaintiffs' expert, the trial judge found that Vinyard and Sons Oil and Gas would only have $1,100 per year per well in actual production cost and that A.J. Bradford would have no production costs because he performed virtually all his own work on the wells. The trial judge deducted from the damages the actual production costs for the wells owned by Vinyard and Sons Oil and Gas and severance taxes on the oil produced.
Eland Energy further asserted that Plaintiffs' recovery must be limited only to the percentage of their ownership as the mineral lessees. The trial judge was not persuaded by this argument, however, finding that the damages awarded must include the interest of the mineral lessors (the landowners). Citing the obligations of the lease contracts requiring Plaintiffs to pay the mineral lessors, the trial judge found that, if the wells had produced gas and Eland Energy had paid for the production, Eland Energy would not have been entitled to deduct the interest of the mineral lessors when it paid Plaintiffs. The trial judge found that, since Plaintiffs, as mineral lessees, are required to disburse the proceeds to the mineral lessors, *762 then damages, including both the interest of the mineral lessees and the interest of the mineral lessors, must be awarded.
Judgment was awarded to Vinyard and Sons Oil and Gas in the amount of $30,624.08 for damages resulting from its loss of gas and oil production.[12] Further, judgment was awarded to A.J. Bradford in the amount of $49,224.68 for loss of gas production.[13] In calculating the damages, the trial judge adopted the calculation of Plaintiffs' expert, finding that only limited costs and expenses of production were to be deducted from the damages. The damages awarded by the trial judge were calculated to include not just the interest of the Plaintiffs as mineral lessees, but also the interest of the mineral lessors (the landowners of the property). Damages were awarded to include interest from the date of judicial demand. The trial judge dismissed Sun Limited and Oryx Energy from the case. Following the judgment, Eland Energy moved for a new trial, but this motion was denied. Eland Energy now appeals the judgment of the trial court, raising the following assignments of error (verbatim):
1. Although the trial court correctly found that it was unprofitable for Eland to take plaintiffs' gas, it erred by rewriting a contractual provision to improperly impose a thirty-day notice requirement on Eland, disregarding Eland's contractual right to cease taking gas, without notice, based on unprofitability;
2. In the alternative, the trial court erred in calculating damages for lost oil and gas production without deducting proper and reasonable costs and expenses to be incurred by such production;
3. Again alternatively, the trial court erred in awarding damages to plaintiffs for property interests in the oil and gas leases that plaintiffs did not own; and
4. Finally, in the alternative, the trial court erred in awarding legal interest running from the date of judicial demand on plaintiffs' prospective breach of contract damages.
Plaintiffs also appeal the judgment of the trial court, raising the following assignments of error (verbatim):
1. The trial court committed reversible error when it failed to find Sun liable for the bad faith breach of contract; and
2. The trial court committed reversible error by finding that Eland had a right to cancel the plaintiffs' contracts on March 1996 by written notice and tender of $10.00 when the Delhi plant had excess capacity to process additional gas.

DISCUSSION

Termination of Gas Purchase Contract
Eland Energy argues that the trial judge did not properly interpret and apply the Unprofitable Gas Clause of the gas purchase contracts between it and Plaintiffs and that it should not have been required to give 30 days notice to Plaintiffs *763 before suspending taking gas from their wells. Further, Eland Energy contends that the standard of review for an appellate court in interpreting a contract requires the court to independently determine whether the trial court's decision was legally correct or legally incorrect. Irrespective of Eland Energy's arguments, however, the trial judge did not find that the gas extracted from Plaintiffs' wells had become unprofitable to Eland Energy, but, instead, found that the profitability of the gas extracted from Plaintiffs' wells actually had nothing to do with Eland Energy's decision to terminate the contracts in this case. If unprofitability had nothing to do with Eland Energy's decision, then it is unnecessary to interpret the Unprofitable Gas Clause in this case. We agree with the trial judge's finding of fact and we will review the trial court's judgment under the manifest error standard of review.
A court of appeal should not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Stobart v. State through Dept. of Transp. & Development, 617 So.2d 880 (La.1993). The reviewing court must do more than just simply review the record for some evidence which supports or controverts the trial court's findings; it must, instead, review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Id. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. Cosse v. Allen-Bradley Co., 601 So.2d 1349 (La. 1992). If the trial court's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Housley v. Cerise, 579 So.2d 973 (La.1991) (quoting Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990)).
Eland Energy cannot have the Unprofitable Gas Clause applied in the case sub judice unless it proves that unprofitability was the reason it terminated the gas purchase contracts with Plaintiffs. In reviewing the record, we find that Eland Energy did not prove that, subsequent to April 1, 1992, when the contracts were terminated, it was unprofitable for it to extract gas out of Plaintiffs' wells and it did not prove that it ceased purchasing gas from Plaintiffs' wells for that reason.
The great weight of the evidence supports the trial judge's conclusion in this case. The President of Eland Energy, Tim Allen ("Allen"), told Plaintiffs that Eland Energy needed as much gas as it could get from Plaintiffs. After the gathering system was sold to Onshore, Allen told Plaintiffs that they would have to go through Onshore to get their gas to the Delhi Plant. Eland Energy attempted to change its contractual obligations to Plaintiffs by placing Onshore in the middle of the transactions with Plaintiffs. When Onshore began dealing directly with Plaintiffs, Onshore attempted to change the contract by adding the extra charge for using the gathering system.
Eland Energy asserts that, very soon after it acquired the right to purchase gas from Plaintiffs' wells, it recognized that the deal was unprofitable. The facts of the case do not support this assertion. If the deal was unprofitable, then Eland Energy certainly would have enforced the Unprofitable Gas Clause immediately upon discovering this fact rather than continuing to take gas from Plaintiffs' wells.[14] *764 Eland Energy continued, however, to take gas from Plaintiffs' wells for more than a year and it amended the contract with A. J. Bradford to add the three "Hubbard" wells, which were also in the Big Creek Field. Further, if Plaintiffs' wells were unprofitable as Eland Energy claims, then surely Onshore would not have purchased the gathering system without assurances from Plaintiffs before the purchase was completed that a transportation fee would be acceptable to keep the gathering system and plant operational. In addition, in Onshore's purchase of the gathering system, it agreed to allow Eland Energy to continue to take ten percent of the price paid for the gas. This fact does not support the argument that this deal was unprofitable; because, indubitably, if profits were non-existent, then, from the very beginning of the assignment, Onshore would not have wanted to give ten percent to Eland Energy. Eland Energy asserts that the Delhi Plant as a whole became unprofitable to operate; but, if it were to cancel its contract with Plaintiffs on this basis, then it had to give 30 days notice to Plaintiffs and tender $10.
The facts support the conclusion that Eland Energy replaced itself with Onshore in an attempt to change the contractual obligations of the parties. On March 24, 1992, Onshore sent a letter to Plaintiffs informing them of the additional charge of using the gathering system, a charge that did not exist in the original gas purchase contracts between Sun Limited and Plaintiffs. Onshore also wanted Plaintiffs to assume the line loss of any gas escaping from the gathering system while the gas traveled to the Delhi Plant. At this time, no mention of unprofitability was made to Plaintiffs concerning their wells. On March 25, 1992, a meeting was held between Eland Energy, Onshore and Plaintiffs. Onshore discussed with Plaintiffs various alternatives to the terms of the original contract, but Plaintiffs rejected any changes in the contract. It was only one day later, on March 26, 1992, that Onshore sent a letter to Plaintiffs stating that taking gas from their wells was unprofitable. This is the first mention ever made of unprofitability. Onshore and Eland Energy attempted to change the contract; and, when the Plaintiffs refused to approve the changes, it was only then that unprofitability became an issue. We agree with the trial judge that profitability had nothing to do with the decision to terminate the contracts with Plaintiffs. Eland Energy's first assignment of error is without merit.

Damages Awarded
An award for damages should not be disturbed by a reviewing court absent a showing of a clear abuse of discretion vested in the trial court. Carroll v. St. Paul Insurance Company, 550 So.2d 787 (La.App. 2d Cir.1989). The appropriate procedure for testing whether the trier of fact has abused its discretion by making an excessive award is to determine whether the award can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the fact finder. Graham v. Edwards, 614 So.2d 811 (La.App. 2d Cir.1993), writ denied, 619 So.2d 547 (La.1993).

Damages and Production Costs
In Eland Energy's second assignment of error, it argues that the trial judge erred by not deducting the correct production costs from the damages awarded *765 to Plaintiffs. Finding that the Plaintiffs' expert witness established actual costs versus the estimated costs provided by Eland Energy's expert witness, the trial judge adopted the actual costs. We agree with the trial judge's conclusion.
The trial judge deducted no production costs from the damages to A.J. Bradford, finding that, due to his extensive experience in dealing with gas wells, he was able to perform the work himself on his wells. It was established at trial that these wells were only gas wells and did not develop paraffin buildup that occurs in oil wells. Further, the trial judge deducted $1,100 per year per well for the Vinyard and Sons Oil and Gas wells and deducted that cost from the damages awarded to Vinyard and Sons Oil and Gas. Plaintiffs' expert testified at trial that these were the actual production costs for these wells. Vinyard and Sons Oil and Gas was able to provide much of the labor itself on its wells. Moreover, Eland Energy's expert witness estimated the production cost and included costs that small operators such as Plaintiffs would not normally incur. Weighing the credibility of both experts and the testimony of Plaintiffs, the trial judge found Plaintiffs' expert to be more credible. The trial judge did not abuse his discretion in awarding damages, deducting only limited production costs based on the calculations of Plaintiffs' expert; and, therefore, Eland Energy's second assignment of error is without merit.

Damages Including Interests of Mineral Lessors
Eland Energy argues in its third assignment of error that the trial judge should not have included the interest of the mineral lessors (the landowners of the property) when damages were awarded. Further, Eland Energy asserts that the mineral lessors were not parties to this lawsuit and that the mineral lessees, the Plaintiffs, were given damages based on interests that they did not own. In addition, Eland Energy contends that royalties paid to the mineral lessors must be paid only when gas is produced; and, because there was no production here, then no royalties are owed under the leases. The trial judge did not agree with Eland Energy's arguments, finding that Plaintiffs are still obligated to pay the mineral lessors out of the damages received from this lawsuit. We agree with the trial judge's finding.
First, the Royalty Clause in the gas purchase contracts states:
Seller agrees to account and pay to the lessors, royalty owners and owners of other interests under the committed leases, in strict accordance with the applicable agreements, the royalty and other interests in the gas sold and delivered hereunder to Buyer.
The Oil, Gas and Mineral Lease agreed to by the mineral lessors and the mineral lessees states, in pertinent part, in paragraph four:
The royalties to be paid by Lessee are... on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale.... (Emphasis added.)
In Frey v. Amoco Production Company, 603 So.2d 166 (La.1992), the supreme court held that the mineral lessee, after receiving a settlement in a dispute with the gas buyer, had to pay the mineral lessor his interest from the damages awarded to the mineral lessee. The court found that:
The lease (between the mineral lessor and the mineral lessee) represents a bargained-for exchange, with the benefits flowing directly from the leased premises to the lessee and the lessor, the latter via royalty. An economic benefit accruing from the leased land, generated solely by virtue of the lease, and *766 which is not expressly negated, see La. R.S. 31:3, is to be shared between the lessor and lessee in the fractional division contemplated by the lease.
Amoco Production Company, the mineral lessee in this case, made the same argument that Eland Energy now makes before us, that there must be an actual sale of gas produced in order for the mineral lessor to be included in the award of damages. The supreme court rejected this argument and we are constrained to follow the supreme court's holding on this issue.
The court in Frey, supra, further found that the settlement was part of the "amount realized" portion of the mineral lease and, therefore, subject to the lessor's royalty clause.[15] Moreover, the court found that the proceeds of the settlement constituted economic benefits which are derivative of the mineral lessee's right to develop and explore the leased property, a right conferred by and dependent upon the lease between the mineral lessor and mineral lessee. The court cited La. R.S. 31:122 in support of its analysis. La. R.S. 31:122 provides, in pertinent part:
A mineral lessee is ... bound to perform the contract in good faith and to develop and operate the property leased as a reasonably prudent operator for the mutual benefit of himself and his lessor. (Emphasis added.)
The mineral lessor assumes a passive role after it enters into a lease with a mineral lessee and the lessee assumes a superior position according it exclusive control over the development and management of the property for the production of minerals. This development and management includes the exclusive ability to sue for breach of contract if the purchaser of the gas breaches its contract with the mineral lessee, as occurred in the instant case. The court in Frey, supra, held that the mineral lessee should not be able to exclusively enjoy the benefits of the settlement while refusing to share the benefits with the mineral lessor; and, thus, the settlement inures to the mutual benefit of both the mineral lessee and the mineral lessor. We reject Eland Energy's arguments here and find that the trial judge correctly awarded damages to Plaintiffs by including damages for the mineral lessor. Eland Energy's third assignment of error is without merit.

Damages for Legal Interest from Date of Judicial Demand
Eland Energy argues that the trial judge erred when Plaintiffs were awarded damages with legal interest from the date of judicial demand. In support of its argument, Eland Energy cites the case of Corbello v. Iowa Production, 02-0826 (La.2/25/03), 850 So.2d 686. Eland Energy argues that the supreme court in Corbello, supra, found that legal interest is recoverable on debts arising ex contractu (debts arising from a contract) from the time they become due and the debt in this case arose from a contract. Further, Eland Energy contends that the decision in Corbello, supra, expressly overruled the existing supreme court precedent found in Trans-Global Alloy Limited v. First National Bank of Jefferson Parish, 583 So.2d 443 (La.1991)[16] and Alexander v. Burroughs Corporation, 359 So.2d 607 (La.1978). We do not agree.
In Trans-Global Alloy Limited, supra, the supreme court held that, in a breach of contract case, a prevailing party is entitled *767 to legal interest from date of judicial demand even though damages are not ascertainable until the date of judgment. The supreme court in Alexander, supra, similarly held that, in a breach of contract case, a plaintiff is entitled to legal interest from date of judicial demand. The court in Alexander, supra, rejected the defendant's argument that the plaintiffs' suit was grounded in contract and that La. 13:4203[17] did not apply. The court found that it did not matter that the suit had a contractual rather than a delictual source.
We find that the supreme court in Corbello, supra, did not expressly overrule Trans-Global Alloy Limited, supra, and Alexander, supra. The Corbello, supra, court did not hold that interest is recoverable on debts arising in all breach of contract cases only from the time they become due. The court's general discussion of ex delicto and ex contractu in Corbello, supra, was just that, a general discussion of those two theories under which many causes of action exist. In addition, the discussion was based on the citation to a line of very specific contracts cases and a very specific code article, La. C.C. art.1938. The issue in the instant case does not concern that code article, nor does it concern the issue prevailing in Corbello, supra, or the cases cited therein. The trial judge in the case sub judice did not abuse his discretion in any of the damages awarded to Plaintiffs; and, therefore, Eland Energy's final assignment of error is without merit and interest in this case is due from date of judicial demand.

Dismissal of Sun Limited from Lawsuit
Plaintiffs argue on cross appeal that the trial judge should not have dismissed Sun Limited from the lawsuit. Even though Sun Limited sold the gas purchase contracts to Eland Energy, the Plaintiffs assert that they never released Sun Limited from any of its obligations under the contracts. As previously stated, the Assignment Clause of the gas purchase contracts provides, in pertinent part, that:
This contract shall extend to and be binding upon the parties hereto, their heirs, administrators, successors and assigns.
Further, as previously noted, La. C.C. art. 1821 provides, in pertinent part:
An obligor and a third person may agree to an assumption by the latter of an obligation of the former.
The obligee's consent to the agreement does not effect a release of the obligor.
This is not a case where novation has occurred. La. C.C. art. 1880 provides:
The intention to extinguish the original obligation must be clear and unequivocal. Novation may not be presumed.
When a new obligor is substituted for a prior obligor, novation takes place only when the prior obligor is discharged by the obligee. See La. C.C. art. 1882.
We find no evidence in the record before us that Plaintiffs, as the obligees, released or discharged Sun Limited, as the original obligor, from any of its obligations under the gas purchase contracts. Without such a release or discharge, Sun Limited continues to remain liable to Plaintiffs. The gas purchase contracts were freely assignable, but the law in Louisiana sets forth that, when an obligation is assigned, the original obligor is not released or discharged unless expressly done so by the obligee. We find merit in Plaintiffs' first assignment of error and, therefore, hold that the trial judge committed reversible error in dismissing Sun Limited from this lawsuit.

*768 Excess Capacity of Plant and Right to Cancel Contracts

Plaintiffs contend that the trial judge erred in finding that Eland Energy had a right to cancel the gas purchase contracts in 1996 even though the Delhi Plant had excess capacity to continue to take gas from Plaintiffs' wells. The trial judge found that Eland Energy effectively cancelled the gas purchase contracts in 1996. Effective cancellation would occur only if Plaintiffs' gas wells were unprofitable. The trial judge applied the Unprofitable Gas Clause of the contract to uphold Eland Energy's cancellation of the contract. Irrespective of the Unprofitable Gas Clause, Plaintiffs argue that the Obligation to Take Clause preempts the Unprofitable Gas Clause. The Obligation to Take Clause of both contracts states:
Any other provision herein to the contrary notwithstanding, Buyer, acting for itself and as agent of each of the other owners of the gasoline plant as provided herein above agrees to take gas hereunder when and only when there is sufficient excess capacity in said plant to process such gas. Excess capacity as herein used shall mean plant capacity over and above that required to process all the casinghead gas produced by the owners of said plant. In the event of excess capacity, Buyer agrees to take ratably from all of the gas connected to its plant produced by Sellers not owning an interest in the plant. It is further provided that if at any time the pressure at the point of delivery exceeds thirty (30) psig, Buyer shall have no obligation to take said gas.
Plaintiffs' contention is that, even if the gas from their wells is unprofitable, Eland Energy still must take their gas if Eland Energy's gas plant has excess capacity. We find that this argument would lead to an absurd conclusion.
La. C.C. art.2049 provides:
A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not one that renders it ineffective.
Further, La. C.C. art.2050 provides:
Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.
The Unprofitable Gas Clause of the gas purchase contracts and the Obligation to Take Clause arguably conflict with each other. In interpreting the meaning of each clause, however, we find that they are distinct and can coexist with each other to make the contract effective as a whole. The Unprofitable Gas Clause is designed to cancel the contract if the Plaintiffs' wells become unprofitable to the Buyer of the gas. This is separate and distinct from the intent of the Obligation to Take Clause, which has to do with excess capacity in the plant.
La. C.C. art.2046 further provides:
When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. (Emphasis added.)
We find that, if the Obligation to Take Clause were to preempt the Unprofitable Gas Clause, then absurd consequences would occur. Eland Energy would have to take Plaintiffs' gas in infinity as long as its plant had excess capacity to take the gas, even though Plaintiffs' gas wells were unprofitable. In effect, this theoretically could lead to Eland Energy's insolvency if it had to continue to take unprofitable gas forever. The trial judge found that Eland Energy had effectively cancelled the contracts with Plaintiffs in 1996 under the Unprofitable Gas Clause. The Obligation to Take Clause does not preempt the Unprofitable Gas Clause; and, thus, Plaintiffs' final assignment of error is without merit.

*769 CONCLUSION
For the foregoing reasons, the judgment of the trial court in favor of Plaintiffs, Vinyard and Sons Oil and Gas and A.J. Bradford, is affirmed as to the liability of Defendants, Eland Energy and Onshore, to Plaintiffs, and as to all damages, including interest from date of judicial demand, awarded for their loss of oil and gas production. Further, the judgment of the trial court is affirmed as to its finding that Eland Energy effectively cancelled the gas purchase contracts in 1996. The judgment of the trial court is reversed as to its dismissal of Sun Limited from this lawsuit. Costs of this appeal shall be divided one-third (1/3) to Plaintiffs, Vinyard and Sons Oil and Gas and A.J. Bradford, and two-thirds (2/3) to Defendants, Eland Energy, Inc. and Sun Limited.
AFFIRMED IN PART AND REVERSED IN PART.

APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, STEWART, PEATROSS, and DREW, JJ.
Rehearing denied.
NOTES
[1] Frank Ray Vinyard, Sr. and Audie Mae Vinyard entered into Oil, Gas and Mineral Leases with Vinyard and Sons Oil and Gas whereby the property on which the wells were located was leased to Vinyard and Sons Oil and Gas for mineral exploration. Vinyard and Sons Oil and Gas was given the right to enter into gas purchase contracts with potential buyers for gas taken out of all five wells. Mr. and Mrs. Vinyard reserved a one-half (1/2) mineral royalty in Vinyard B No. 1, Vinyard C No. 1 and Vinyard D No. 1, and a one-fifth (1/5) mineral royalty in Vinyard No. 1 and Vinyard No. 2.
[2] The Delhi Plant was owned by Sun Limited. The Delhi Plant housed equipment that processed (extracted liquids from) the gas delivered to it.
[3] The gas purchase contracts for both Plaintiffs are identical.
[4] Ben Scott Pipes, Jr., Balfour Pipes, Guy C. Williamson, Ethel Williamson, Durwood Russell Jinks, Martha Jinks, the First Republic Bank and Sherry Lorraine Silk entered into an Oil, Gas and Mineral Lease with A.J. Bradford whereby their property was leased to A.J. Bradford for mineral exploration. A.J. Bradford was given the right to enter into gas purchase contracts with potential buyers for gas taken out of the gas well known as Ben S. Pipes No. 1. The aforementioned lessors reserved a three-sixteenths (3/16) mineral royalty in Ben S. Pipes No. 1.
[5] Lewis Hubbard, III and Laura Hubbard entered into Oil, Gas and Mineral Leases with Lewis Hubbard, Jr. and Doris Hubbard whereby their property was leased to Lewis Hubbard, Jr. and Doris Hubbard for mineral exploration. Lewis Hubbard, Jr. and Doris Hubbard were given the right to enter into gas purchase contracts with potential buyers for gas taken out of the gas wells known as Lewis Hubbard No. 1, Lewis Hubbard No. 2 and Lewis Hubbard III No. 1. Lewis Hubbard, III and Laura Hubbard reserved a one-fifth (1/5) mineral royalty in these three wells. Subsequently, Lewis Hubbard, Jr. assigned a "Working Interest" to A.J. Bradford, whereby A.J. Bradford received a fifty percent (50%) working interest in these gas wells. Also, Doris Hubbard later executed a "Ratification and Quitclaim" of this assignment of working interest over to A.J. Bradford.
[6] MCF is the total volume of gas that flows through the meter. Gas volume is reported in thousand cubic feet.
[7] The Transfer of Title Clause of the gas purchase contracts states:

Upon receipt of said gas by Buyer, title thereto shall pass to and vest in Buyer at the delivery place described herein.
The Delivery Place Clause states:
The delivery of the gas shall be made at a point mutually agreeable to Buyer and Seller.
Sun Limited and Plaintiffs agreed that the delivery place would be at the meter.
[8] In September 1992, however, Onshore did request Vinyard and Sons Oil and Gas to open its valves to allow gas to enter the gathering system so that Onshore could test the system for leaks.
[9] Oryx Energy signed the gas purchase contracts as the managing general partner for Sun Limited.
[10] Eland Energy is not relieved from its obligations under the gas purchase contract with Plaintiffs just because it made an assignment to Onshore. The Assignment Clause of the contract provides, in pertinent part, that:

This contract shall extend to and be binding upon the parties hereto, their heirs, administrators, successors and assigns.
Moreover, La. C.C. art. 1821 provides, in pertinent part:
An obligor and a third person may agree to an assumption by the latter of an obligation of the former.
The obligee's consent to the agreement does not effect a release of the obligor.
[11] The expert for Eland Energy also made deductions for the interest of the mineral lessors and severance taxes, whereas, Plaintiffs' expert did not.
[12] The judgment also included an award of $11 for reimbursement of a January 1992 transportation expense charged by Onshore. The judgment was awarded with legal interest from the date of judicial demand until paid and for all costs of the proceedings, including expert witness fees.
[13] The judgment also included an award of $921 for reimbursement of a January 1992 transportation expense charged by Onshore. The judgment was awarded with legal interest from the date of judicial demand until paid and for all costs of the proceedings, including expert witness fees.
[14] Moreover, if the gas wells were unprofitable, then surely Eland Energy would have done the research to note this fact when it purchased the wells from Sun Limited; and, yet, nothing in the record indicates that anything was mentioned between Sun Limited and Eland Energy that the wells were unprofitable.
[15] The mineral lease in Frey, supra, is similar to the mineral lease in the case sub judice, including the provision covering the "amount realized."
[16] Part of this decision was superseded by statute on other grounds.
[17] La. R.S. 13:4203 provides,

Legal interest shall attach from date of judicial demand, on all judgments, sounding in damages, "ex delicto," which may be rendered by any of the courts.